United States v. Harvey W. Knowlton.

---

UNITED STATES v. HARVEY W. KNOWLTON.

1. INDIAN COUNTRY: The term "Indian Country" includes such portions of the public domain as are expressly reserved for the use and occupation of the several bands and tribes of Indians; and which are not included within the jurisdiction of any state or territorial government.

2. RESERVATION BY EXECUTIVE ORDER: The authority of the President to withdraw from sale a portion of the public domain, and set it apart for the use of the several tribes of Sioux Indians, as an addition to their existing treaty reservation, cannot be questioned.

United States v. Harvey W. Knowlton.

3. JURISDICTION EXTENDED OVER: Such executive order withdrew that portion of the public domain from the operation of the criminal laws of the territory: the trade and intercourse laws were thereby extended over such district of country, and it became Indian country within the meaning of the acts of Congress extending the crimes act to the Indian country.

4. EXECUTIVE ORDER: REVOCATION OF: EFFECT ON PENDING INDICTMENT: The revocation of the executive order setting apart such portion of the public domain as an addition to the existing reservation, did not affect the jurisdiction of the court to try defendant, upon an indictment for a homicide, committed in such district of country, pending at the time of such revocation.

5. IMPEACHING WITNESS: CROSS-EXAMINATION OF: Where an impeaching witness, on his direct examination, testifies to a part of a conversation, it is error to exclude the rest of such conversation, when material to the case, upon cross-examination; particularly when the balance of such conversation tends to explain the apparently contradictory statements of the witness sought to be impeached.

6. SELF DEFENSE: APPREHENSION OF DANGER: THREATS: FIRST ATTACK. Communicated threats serve to put a man upon his guard to protect himself. But a bare fear or apprehension arising solely from previous threats, affords no excuse, unless at the time of the killing some effort, movement or overt act was being made by the party killed to carry such previous threats into execution, and a necessity, real or apparent, existed at the time, for the killing to prevent the accomplishment of such previous threats; and if defendant committed the first aggressive act he cannot claim the benefit of the law of self defense.

7. APPREHENSION: REASONABLE GROUNDS OF: WHO TO JUDGE OF. The jury who try the cause, and not the party who kills, are to review and judge of the reasonable grounds of his apprehension and of the imminency of the danger.

*Writ of Error to the Second Judicial District Court.*

At the April, 1877, term of the Second Judicial District Court, the defendant was indicted for the murder of one David Rauck, alleged to have been committed on April 10, 1877, "in the Sioux "reservation set apart by order of the President of the United " States, dated January 11th, 1875, near a place in said reservation "called Fort Pierre, in said district and territory, which was " then and therein the Indian country and within the jurisdiction " of this court."

The cause was tried, and Dec. 27th, 1881, the jury returned a verdict of manslaughter against the defendant.

On the trial the court charged the jury upon the law of self defense as follows:

" Admitting the killing, he contends in court here, that such "killing was in self-defense, or in other words that it was excusable " or justifiable. Where one person kills another in actual " self-defense, the common law declares it to be excusable homi-" cide and not punishable. In general this right exists where " one is suddenly assaulted, and in the defense of his person and " where immediate and great bodily harm would be the apparent " consequence of waiting for the assistance of the law, and there " is no other probable means of escape, he kills his assailant."

" The right of self-defense is founded on the law of nature, and " is a law of necessity, and that necessity must be real or appar-" ently real. Therefore when homicide is committed in the law-" ful defense of a man's person and at a time when there is a " reasonable ground to apprehend a design to do the slayer some " great personal injury and imminent danger of such design being " accomplished, such homicide is ranked as excusable (or as the " statute of Dakota names it, justifiable.)"

" It must be in *lawful defense* of the person; and defense im-. " plies the assailing party, or one who by some overt act, or " threatening movement makes the first aggression or attack. If " the party killed did not make any such assault or do any overt " act or make any such aggressive or hostile movement—in other " words, if there was no imminent danger and no reasonable "ground for apprehension of great bodily injury, either real or " apparent, then the doctrine of self-defense is not available. Two " things must concur; first, there must be reasonable ground for " apprehension of great bodily harm, and secondly, imminent " danger to body or life. Imminent danger means immediate

United States v. Harvey W. Knowlton.

" danger, danger quickly to come. When a person, who is without " fault himself is *attacked* by another in such manner or under " such circumstances as to furnish reasonable ground for appre- " hending a design to take away his life, or to do him some great " bodily harm, and there is reasonable ground for his believing " the danger imminent that such design will be accomplished, he. " may safely act upon appearances, and kill the assailant, if that " be necessary to avoid the apprehended danger; and the killing " will be excusable, although it may afterwards turn out that the " apprehensions were false, and that there was in fact neither de- " sign to do him serious injury, nor danger that it could be done."

" He must decide at his peril upon the force of the circum- " stances in which he is placed, for that is a matter which is " subject to be examined into in a court of justice and before a " jury. "

" The jury who try the cause, and not the party who kills, are " to review and to judge of the reasonable grounds of his appre- " hension and of the imminency of the danger ; that is, whether " there was present, immediate, and imminent danger. Communi- " cated threats, if any, serve to put a man upon his guard and to " take necessary steps to protect himself. But a bare fear or ap- " prehension arising solely from previous threats, without any- " thing more, affords no excuse—none whatever, *unless* at the " time of the killing some effort, movement, or overt act, was be- " ing made by the party killed to carry such previous threat into " execution, and a necessity, apparent or real, existed at the time " for the killing in order to prevent the accomplishing of the " previous threats. The defendant alleges and insists generally " that the deceased and others with him, came armed into Wal- " pole's camp, upon that day, with the purpose and avowed intent " to forcibly take from him or O'Neil or both of them, the watch " and money which had been obtained from the Englishman (so " called) that day at an alleged game of " card monte." And

" that threats had been made by deceased and others, that if the
" money and watch were not delivered up, the defendant would
" be killed.   I do not pretend, in this statement of the evidence
" to give anything more than a general idea or suggestion of the
" evidence, all of which you will remember.   What I wish to say
" is, that if the defendant had thus obtained the money and watch,
" or had assisted in obtaining such property, any force used or to
" be used in getting the property back would be illegal.   You,
" gentlemen of the jury, are to consider all of the evidence in the
" case, and all the circumstances; and it is your duty to determine
" what it was that brought the deceased and the others to Walpole's
" camp—that is to say, what was really and actually their purpose."

" The prosecution on the other hand insists that the deceased
" and the others did not go up there with any intent or purpose to
" do the defendant any bodily harm; that there is no credible' evi-
" dence of any such purpose or intent or of any threats; and that
" if the deceased and the others went up armed, it was in accord-
" ance with the habits of such emigrants when encamped among
" numerous strangers in that section of the country, and at that
" time, over four years ago."

" You are to determine all these contested points, and if you
" should find that the deceased and others did actually go there
" with the purpose and intent claimed by the defense, then you
" are to consider all that in connection with the circumstances or
" surroundings of the defendant at the time of the killing."

" A man who is in the lawful possession of personal property
" may resist any attempt to take it from him by force or violence,
" provided that in such resistance the force or violence he uses is
" not more than is necessary or sufficient to prevent such attack
" upon him."

" But in this case you are to inquire who made the first attack
" or hostile movement or demonstration; for as I have already
" stated, threats alone are insufficient, unless there be also some

" overt or perceivable act or motion on the part of the deceased. " You are to examine carefully into all the evidence to ascertain " who, just before the killing, did commit the first aggressive or " hostile act, for if the defendant did make or commit the first " aggressive act or hostile movement, he cannot claim any benefit " from the law of self-defense."

" In such case the deceased himself or the prosecution for him " (he being dead) could claim that the deceased, if he afterwards " made any movement of his gun, was acting in his own self-de- " fense."

" In other words if the defendant himself first made an hostile " attack or movement or demonstration upon or toward the de- " ceased, the law is that the defendant's plea of self-defense cannot " be available."

" For as I have already stated the person who claims the pro- " tection of the law of self-defense must be without fault himself, " and it must be shown, or made to appear that without being the " first aggressor or assailant himself, he acted in self-defense upon " reasonable grounds for apprehension that some great bodily in- " jury was about to be done to him, and that there was at the time " a present and immediate danger, real or apparent, of such design " being accomplished."

The remaining facts necessary to an understanding of the points passed upon by the court, are stated in the opinion.

*Bartlett Tripp* and *Gamble Bros.*, for plaintiff in error.

Points in brief:

It is only in those places over which the United States has ex- clusive jurisdiction, that her courts have jurisdiction to try offenses of murder and manslaughter. Rev. Stats. U. S. Sec. 5339.

This territory has so much of sovereignty that no place can be said to be within the exclusive jurisdiction of the United States un-

less some special act of Congress has made it so. Murder committed in one of the organized counties is an offense against the territory, and not against the United States. *Franklin v. United States*, 1 Col., 35; *United States v. Reynolds; Clinton v. Englebrecht.*

There is no special law that gave the United States exclusive jurisdiction over the *locus in quo*, at the date of the commission of the alleged offense or at any time since.

Sec. 3145 Rev. Stats. U. S., is relied upon as conferring jurisdiction. Under this section the question is, was the place where the offense is alleged to have been committed "Indian country?" 4 U. S. Stats., 729, Sec. 1.

The test is, has the Indian title been extinguished? If it has not it is Indian country; if it has, it is not Indian country. *Clark et al. v. Bates et. al.*, 1 Dak., 42; Same case, 95 U. S., 204.

Proclamation of President Grant of Jan. 11th, 1875, could not restore the Indian title which had been extinguished by treaty.

The effect of the reservation by such proclamation, is to withdraw the lands from sale and settlement; an act clearly executive and sanctioned by usage and Congress itself. *Grisar v. McDonald*, 6 Wall., 380.

Territorial courts exercise jurisdiction over military reservations not in the Indian country. Attorney General Cushing, 6 Opinions, 574-5, and again same vol. p. 363-4; *Reynolds v. People*, 1 Col., 179; *Clay v. State*, 4 Kan., 49; *People v. Godfrey*, 17 Johns., 225; *Com. v. Clay*, 8 Mass., 75; *United States v. Bevan*, 3 Wheaton, 388.

Every reservation of the government has the same effect. *Leavenworth, &c., R. R. Co. v. U. S.*, 92 U. S., 747; *United States v. Varela*, 94 U. S., 614; *United States v. Tom*, 1 Oregon, 29; *United States v. Seveloff*, 2 Saw., 311.

It seems to us entirely clear, that since the treaty of 1868, the place of the homicide has never been Indian country.

But conceding that the proclamation of 1875 had the effect contended for by the U. S. Attorney, the proclamation of 1879, it must be conceded, had equal effect. If the first proclamation had the force and effect of a statute in extending the act of 1834, with all its provisions for the punishment of crime, including murder, the last proclamation repealed it, and with the repeal dropped every prosecution pending, in whatsoever stage the same might be.

This position at common law may be considered settled. *Hartung v. People*, 22 N. Y., 95; 1 Pleas of Crown, 291; *Miller's Case*, 1 Wm. Bl., 451; *Rex v. McKeoza*, Russ. & Ry., 429; *U. S. v. Passamore*, 4 Dall., 372; *Com. v. Duane*, 1 Binn., 601; *Yeaton v. U. S.*, 5 Cranch, 281; *Com. v. Kimball*, 21 Pick., 373; *Com. v. Marshall*, 11 Pick., 350; *Howard v. State*, 5 Ired., 183; *Cook v. Board of Police*, 16 Abb. Pr., 478; *State v. McDonald*, 20 Minn., 136.

It cannot be contended that any statutes of the United States, providing saving clauses in cases of repeal, apply to this case; for if any such statutes can be construed to apply to criminal cases at all, there is no such license permitted the courts as to class *proclamations* of the President as *statutes*, whatever legislative effect they may otherwise give them.

As to the extent of the right of cross examination, cited: *Com. v. Goddard*, 14 Gray, 402; *Metzer v. State*, 39 Ind., 596; *Burghart v. Brown*, 51 Mo., 600; *Jackson v. Feather River W. Co.*, 14 Cal., 18; *People v. Murphy*, 39 Cal., 52; *People v. Strong*, 30 Cal., 151; *Searles v. Thompson Bros.*, 18 Minn., 322; *Wilhelm v. Leonard*, 13 Iowa, 335; *Kelsoe v. State*, 47 Ala., 573; *Lightfoot v. State*, 16 Mich., 507; *Phares v. Barber*, 61 Ill., 271; 17 Pick., 490; 2 Gray, 262; 126 Mass., 23.

United States v. Harvey W. Knowlton.

The witness having been attacked by an attempt to show contradictory and inconsistent statements, defendant had the right, either by cross examination or fresh witnesses, to support him by showing that, at a period so remote that he would not be presumed to have them manufactured a story, he had related the occurrence the same as he tells it in court. *State v. Dennis*, 32 Vt., 158; *Robb v. Hackey*, 23 Wend., 50; *State v. Laxton*, 78 N. C., 664; 1 Gray, 83 and 340; *State v. Petty*, 21 Kan., 54; *Brookbank v. State*, 55 Ind., 169; *Green v. Cochran*, 43 Iowa, 544; *Wade v. Thayer*, 40 Cal., 578; *Daily v. State*, 28 Ind., 285; *Coffin v. Anderson*, 4 Blackf., 398; *Beauchamp v. State*, 6 ·Id., 299; *Stewart v. People*, 23 Mich., 63; 2 Phil., on Ev., 4th Ed., 600, n; Wharton Cr., Ev. Sec., 492; Roscoe Cr. Ev., 102-103, and notes.

Upon the law of self-defense, cited: *Tweedy v. State*, 5 Iowa, 438; *Erwin v. State*, 29 Ohio St., 186; *People v Lilly*, 38 Mich., 270; *Runyan v. State*, 57 Ind., 80; *Long v. State*, 52 Miss., 23; *Fortenberry v. State*, 55 Miss., 409-10; *Bohannon v. People*, 8 Bush., 481, reported 8 Am. Rep., 474; *People v. Batchelder*, 27 Cal., 70; *Pond v. People*, 8 Mich., 174; *Patton v. People*, 18 Mich., 834.

*Hugh J. Campbell*, U. S. Attorney, for defendant in error.

This was Indian country at the time of the homicide, under the decisions of the following authorities: *Bates v. Clark*, 95 U. S., 204; 15 Stats. at Large, 635; *Harkson v. Hyde*, 8 Otto, 476; 13 Peters, 509; 6 Wallace, 380; *U. S. v. Cisna*, 1 McLean, 254; *Worcester v. Ga.*, 6 Peters, 515; *U.·S. v. Stahl*, 1 Woolworth, 20; *U. S. v. Sa-loo-da-cot*, 1 Abbott, U. S. R., 377.

As to the power of the President by proclamation to make reservation of the public lands for any purpose, and the statutes of Congress upon which that power is founded, see *Wilcox v. Jackson*, 13 Peters, 509; *Grisar v. McDonald*, 6 Wallace, 380.

The territory covered by President Grant's proclamation of Jan. 11th, 1875, is a treaty reservation. See Johnson's Treaty; 15 Statutes at Large, Sec. 505.

The United States had exclusive jurisdiction over the *locus in quo* at the time of the homicide and of the indictment. *Harkness v. Hyde*, 8 Otto, 476; *Langford v. Meredith*, 11 Otto, 145.

This Court acquired jurisdiction of the offense by the indictment. This jurisdiction is still in the Court.

1st. Because it has still complete jurisdiction of the *locus in quo*, it being now a part of the Second Judicial District; and

2nd. The law creating the offense is unrepealed.

The crime of murder in the Indian country is still a crime by law, unrepealed. The place of the offense is still in the Second Judicial District. So that all the authorities cited by appellant as to the ousting of jurisdiction, either by a repeal of the law or by a change in the territory of the District, are inapplicable.

This is not one of those cases. This is a case simply where a particular place at which a certain crime, when committed, was by law cognizable in the United States courts, was not, at the time of the trial, a place where the same kind of a crime, if now committed, is cognizable by these courts.

*Ergo*, says appellant, that which was cognizable when committed, is no longer cognizable, because a *similar crime now committed* would not be cognizable.

The statement of the proposition refutes it. There is no such doctrine in the authorities. If there were still any doubt, Sec. 13 U. S. R. S. expressly saves the jurisdiction in the case. Treaties have the force and effect of statutes, and are included under the provisions of Sec. 13. *Martin v. Wheaton*, 1 Wheaton, 304; *Foster v. Neilson*, 2 Peters, 253.

Another principle that is applicable to the point in issue is this:

When there is no express repeal of any part of the treaty, treaty and statute should be so construed *together*, and as far as possible the provisions of each should be allowed to stand. *U. S. v. Berry*, 4th Fed. Rep., 745.

The provisions of the law governing crimes and offenses in Indian country, in force at the time of the treaty, became part of the treaty by operation of law, and the United States is bound by these treaty obligations to punish all offenses covered by section 2145 R. S., which should occur at any time in any part of the territory which then or thereafter should become Indian country.

As to the impeaching testimony, the abstract of appellant does not give the whole of the rulings, and offers and testimony bearing on the point in question.

When Budd had testified that he was present at the killing, Mr. Maxon was introduced for the purpose of showing contradictory statements made by Budd to Maxon, as to the time of his presence at the place where the murder was committed.

Counsel for defendant treated this as an impeaching question, and objected to it on the ground that no proper foundation had been laid for such a question, and so the court treated the question, and Maxon was then dismissed from the witness stand and Budd recalled for the purpose of laying the foundation by further cross-examination.

Budd, on the further re-cross-examination, was propounded a formal impeaching question as follows:

Mr. Budd, did you not on the 16th or 17th day of April, 1877, at Pierre, in this territory and district, say to Charles Maxon, this man, that you had got into Pierre two days before the 16th or 17th?

*Ans.*—No, Sir, I did not.

*Q.*—You did not?

*Ans.*—I did not.

Further on, on re-direct examination Budd testifies:

"I had a talk with Maxon, *a day or two after the shooting, but not about the shooting.*"

"I don't recollect of saying anything about the time when I arrived in camp."

Then Maxon was recalled, and the identical question which had been propounded to Budd was propounded to Maxon.

To that question he answered—Yes, sir.

This was in accordance with the practice and rulings of the court as to the manner of putting impeaching questions, and is sustained by the authorities. 1 Wharton Ev., 552, 555; *Conrad v. Guffey,* 16 How., 35; *McKinney v. Neil,* 1 McLean, 540; *Everson v. Carpenter,* 17 Wendel, 419; *State v. Hoyt,* 13 Minn., 132; *People v. Devine,* 44 Cal., 452; *Gaffney v. People,* 50 N. Y., 423; *Kelchingman v. State,* 6 Wis., 426.

On re-examination the witness impeached may be asked as to the details of the contradiction. Wharton Cr. Ev., 485, 482. Appellant did not offer to re-examine the impeached witness. He was permitted to cross-examine the impeaching witness, Maxon, at length.

After a particular cross-examination in which the witness, Maxon, gave all the conversation in question, in full, he was asked:

*Q.*—That's all you remember of the conversation?

*Ans.*—That's all I recollect.

Maxon was dismissed.

Afterwards, the next day we think, he was recalled by defendant for further cross-examination, and then was asked the question objected to. In this question he was asked to state, not anything as

to the former subject upon which both he and Budd had been examined, and Maxon cross-examined. Nothing of the kind. But he was asked what Budd told him as to an entirely different matter, the circumstances of the homicide.

This was not competent evidence nor cross-examination. It was clearly hearsay. It was in every way incompetent as testimony, and irrelevant to any issue. Its object could only have been to raise an inference in the minds of the jury that he had been present at the homicide, *because he had told some one that he had been.* Could anything be balder hearsay? The case in 14 Gray, cited, is not in point. That inquiry on cross-examination was as to witness' own ground for making a particular statement to which he had testified. This is not that case. That was competent testimony. This is incompetent. A difference about as broad as can exist usually between any two things. The very question refused by the court in 14 Gray, was allowed in this case.

And witness, in answer to it, had said that he had told all the conversation which he remembered.

The case in 39 Ind., 597, relates to the doctrine of confessions and admissions, and is the well settled law from time immemorial. But it is not in point here.

The case in 51 Mo., is still further from the point. The issue there was the signing of a note. The conversation in evidence was part of the conversation as to whether defendant did sign the note. Part of defendant's statements on *this point* were admitted, and part rejected. As the court say it was *about the very matter in controversy.* That is not this case. It is the old, old case— where a part of the conversation on a specified subject is given, all must be given.

14 California decides simply that cross-examination ought to be allowed a free range within the subject matter of the examination in chief. It also says that *undoubtedly it cannot go beyond that*

*matter.* There the subject matter was the water that the witness says was running over the flume.

Here the subject matter is—Did Budd say to Maxon that he came to him a day or two before the 16th or 17th of April? The court in 39 Cal., limit the cross-examination to the *same subject matter.* It was an extreme case of a violation of the rule of law. It is not this case.

The argument of counsel on the Maxon testimony has two propositions:

1st. That the question propounded was proper cross-examination.

On this point his authorities do not bear him out, are not in point, and so far as the principles they lay down do apply to this case, are against him.

2d. But the gist of his position—the real proposition that he desires to persuade this court to announce as a part of the law of evidence, when stripped of its garments of rhetoric, and standing out as a bald, naked proposition of law, is this: To prove that Budd was present at the place he said he was by giving in evidence his hearsay statement, unsworn to, to Maxon, that he was present. No single authority cited by appellant, nor that was ever cited, nor that ever will be cited, sustains this bold and original proposition.

Last and most decisive, the question was not competent because it sought to contradict his own witness Budd.

Budd had testified:

*Q.* "You did have some talk with him?" (Maxon.)

*Ans.—"Yes, but not about the shooting."*

Now after this testimony of their own witness, counsel seek to prove by Maxon that Budd did have a *long, detailed* conversation with Maxon about the shooting.

To recapitulate:

There was no error in the ruling of the court, in not allowing the question to Maxon.

1st.    Because it was not cross-examination.

2d.    Because the original question to Budd and to Maxon which was the subject matter of the cross-examination was a strictly impeaching question, limited to a single point, at a certain place and time, and was so treated on defendant's own motion, and on his motion the court so treated it, and was accordingly governed in its rulings.

At defendant's own instance the court thus limited the question. He cannot now be heard to question a ruling brought on by his own motion and to treat the evidence by a different rule than he himself invoked below.

3d.    Because the evidence sought for was hearsay and therefore incompetent.

4th.    Because by the question and offer, the counsel sought plainly to contradict his own witness and it was therefore incompetent.

Self defense is no new question.    It is one of the oldest, and our own district and Supreme Courts have repeatedly settled the law as to this territory.    *U. S. v. Gay*, 2 Dakota, 125;    *U. S. v. Leighton*, 3 Dakota;    *U. S. v. Gallinaux*, 3 Dakota; Code of Dakota;    *U. S. v. Vigol*, 2 Dallas, 347;    *U. S. v. Haskell*, 4 Washington C. C., 402;    *Patterson v. People*, 46 Barlow, 69; *People v. Schryver*, 42 N. Y., 1;    *State v. Martin*, 30 Miss.; *Com. v York*, 9 Metcalf, 115;    *People v. McLeod*, 1 Hill, 436; *Commonwealth v. Selfridge*.

The jury are the judges of the reasonableness of the apprehension.    Selfridge Case.

Retreat:

The law of retreat as laid down by the authorities supports the

charge. Selfridge Case; *Commonwealth v. Drum*, 58 Penn., St.; *People v. John Doe*, 1 Mich., 451; *People v. Sullivan*, 3 Selden, 396; *State v. Benham*, 23 Iowa, 154; *State v. Shippey*, 10 Minnesota, 133; *Isaacs v. State*, 25 Texas, 174.

Nor is there anything in even the most extreme cases of Kentucky and Texas, *when the facts on which* the instructions were delivered, are considered, which contradicts the law laid down in the charge of the court below. *Bohannon v. Commonwealth*, 8 Bush, 481.

The true line of distinction between the law of retreat as applicable to cases of self defense culpable, and self defense justifiable, is well distinguished in a note to Selfridge's case. Horrigan's Cases, p. 32; Dakota Code, p. 766, p. 890.

Assault brought on by slayer as modifying doctrine of self defense:

On this point we ask attention to the following authorities: Selfridge Case, Horrigan's Cases, p. 24; *State v. Shipley*, 10 Minnesota, 223; *Regina v. Smith;* Horrigan's Cases, p. 130; 1st Bish. Crim. Procedure, p. 1279; *White v. State*, 17 Ark., 404; *People v. Mark*, 2 Parker Cr., 673; *Yancy v. State*, 20 Texas, 656.

Moody, J. At the April term, 1877, of the district court for the Second district, the plaintiff in error was indicted for the murder of one David Rauck, and having thereafter been arrested he was, at the November, 1881, term of said court, tried and convicted of manslaughter.

The offense is alleged to have been committed April 10th, 1877, at what is now known as Pierre, in the county of Hughes, but then Indian country.

The contention for the plaintiff in error is, that the offense of

VOL. III—10

murder committed at the place thus alleged, was not an offense against the United States because it was not committed at a place within the sole and exclusive jurisdiction of the United States, nor in the Indian country within the meaning of the acts of Congress extending the Crimes Act to the Indian country; and therefore the jurisdiction of the offense was not in the court while sitting as and exercising the jurisdiction which pertains to district and circuit courts of the United States, but that the crime was one committed against the laws of the territory, and cognizable, if at all, only in the court sitting for the counties and sub-divisions, and to be prosecuted in the name of the territory.

To define what is Indian country, within the meaning of the act of congress punishing crimes therein committed, is not entirely free from difficulty. The definition given in the act of congress, if not absolutely repealed, has become obsolete and without meaning, as applied to the present condition of the country west of the Mississippi river.

Without entering into a more elaborate definition, it is sufficient for the purposes of this case, to say that the term Indian country includes such portions of the public domain as are expressly reserved for the use and occupation of the several bands and tribes of Indians, and which are not included within the jurisdiction of any state or territorial government.

By the treaty with the Sioux Indians proclaimed February 24th, 1869, 15 U. S. Statutes at Large, page 635, it is among other things, provided that a certain district of country in this territory therein described, together with all existing reservations on the east bank of the Missouri river, shall be set apart for the use and occupation of the Indians therein named; and in article 2nd. of said treaty, it is further provided that they shall have the exclusive use of such district of country and "of all such territory as may be added to this reservation for the use of said Indians."

On the eleventh day of January, 1875, the then President of the United States, U. S. Grant made and proclaimed the following executive order:

EXECUTIVE MANSION, Jan. 11th, 1875.

" It is hereby ordered that the tract of country in the territory " of Dakota lying within the following described boundaries, viz.: " Commencing on the east bank of the Missouri river where the " 46th parallel of north latitude crosses the same; thence east with " said parallel of latitude to the 99th degree of west longitude, " thence south with such degree of longitude to the east bank of " the Missouri river, thence up and with the east bank of said river " to the place of beginning, be, and the same hereby is, withdrawn " from sale, and set apart for the use of the several tribes of Sioux " Indians, as an addition to their present reservation in said terri- " tory."

This tract includes the *locus* of the crime charged against the plaintiff in error.

The authority of the President to make such an order and there-by to reserve the district of country therein described, for such uses, cannot reasonably be questioned, and has been affirmed by several decisions of the Supreme Court of the United States.

Such district of country was, by the treaty, and the action of the President, taken out of the operation of the criminal laws of the territory. The trade and intercourse laws of the United States were extended thereover, as well as the laws for the punishment of crimes, and it was constituted Indian country within the meaning of the acts of congress extending the Crimes Act to the Indian country. It follows that the offenses of murder and manslaughter therein committed, were offenses against the United States, punishable under its laws, and that the District Court sitting for the whole district and exercising the jurisdiction which pertains to the District and Circuit Courts of the United States,

had jurisdiction of this offense at the time of the finding of the indictment, and continued to have such jurisdiction, unless ousted thereof by the effect of the subsequent executive acts to which I shall refer.

By an order of the President, dated August 9th, 1879, all that portion of the Sioux reservation, in Dakota territory, created by executive order of January 11th, 1875, (including the place of this crime), was restored to the public domain.

The further contention is that this subsequent executive order operated to repeal the acts of congress punishing crimes committed in that portion of the Indian country, and with such repeal this prosecution must fall.

Without considering the question of power involved, in view of the treaty stipulations, the effect is not as claimed by the learned counsel. The commission of murder in the Indian country is still a crime against the United States. The same court now has jurisdiction over that particular place to punish crimes there committed against the United States. The judicial district is the same; the jurors are drawn from the same district of country, and moreover, section 13, U. S., Rev. Stat., expressly preserves the jurisdiction of the court, notwithstanding the repeal of a criminal statute, over an offense committed before such repeal. Certainly no greater effect can reasonably be given to this subsequent executive order, than should be given to the express repeal of a statute punishing an act as criminal.

The District Court therefore properly exercised its jurisdiction in this case.

During the progress of the trial a witness, Budd, was called by the plaintiff in error, who testified that he was present at the time of the homicide, and gave evidence tending to prove the killing was in self defense. Upon his cross-examination, (being recalled for the purpose), in answer to a question propounded to him by

the United States Attorney, he denied having said to Charles Maxon—a witness for the prosecution—that he had arrived at Pierre two days before the 16th or 17th of April, 1877. Charles Maxon was then called by the prosecution to prove that Budd had told him at Pierre, on the 16th or 17th of April, 1877, that he, Budd, had arrived at that place two days before, the object being to discredit Budd in his testimony as to what occurred at the scene of the homicide, such homicide having occurred, by the undisputed evidence, on the 10th of April, six or seven days before the alleged time of the conversation between the witnesses, Maxon and Budd. After he had so testified in chief, upon his cross-examination in relation to the declaration of Budd, the defendant's counsel asked Maxon the following question: "You spoke of a conversation you had with Mr. Budd sometime about the 16th or 17th of April, 1877; Did he tell you at that conversation anything with regard to this homicide?" This question being objected to by the U. S. Attorney, the objection sustained by the court, and the ruling duly excepted to, the defendant's attorney asked the witness, Maxon: "What, if anything further, was said in the conversation you have just testified to," and offered to prove by this witness that at the time and place of such conversation given in chief, and as a part of it, the said Budd told the witness, Maxon, that he, Budd, was present at the Ranck homicide, and detailed to him, Maxon, the facts of the killing as he saw them.

This question and the offer being objected to by the U. S. Attorney, the court sustained the objection and the evidence was excluded. To which ruling the defendant duly excepted.

In his examination in chief the witness Maxon had testified, as we have seen, that Budd told him on the 16th or 17th of April, that he had arrived at Pierre two days before, that is four or five days after the homicide. The sole pertinency of this testimony consisted in its tendency to contradict by such statements made out of court, what he, Budd, had testified to in court, to wit: That

he was present at the homicide.   In other words it was an attempt
to impeach Budd by showing that he had made statements out of
court contradictory to those made in court from the witness stand.
Surely anything which transpired in that conversation which
tended to explain such alleged contradictory statements, or which
tended to show that his statements then made, were not in fact
contradictory to what he had testified in court, was pertinent and
was proper to be drawn out upon cross-examination of the witness
who had testified to such contradictory statements.

No rule is plainer than that a party has the right upon cross-ex-
amination to have given all other parts of the same conversation,
not given in the examination in chief, which will serve to explain
or to modify the tendency of that part testified to in chief.

It will be borne in mind that Maxon did not testify to the fact
of Budd's arriving in Pierre two days before the 16th or 17th of
April, but only that Budd told him he had then arrived there.   If
he had been permitted to testify that, in the same conversation,
Budd had told him he was present at the homicide, and had de-
tailed to him the facts that then occurred, it would have tended to
explain the other statement and to remove the impression it was
calculated to make upon the minds of the jury, and to show that
either Maxon was mistaken in his statement as to the time when
Budd said he had arrived, or that Budd had carelessly given an
erroneous date of his arrival, a fact wholly unimportant except so
far as it had connection with his presence at the scene of this
homicide.   The testimony of Maxon in chief, was important and
material in throwing discredit upon Budd's testimony, and the de-
fendant, as well as Budd, had the right to have all the conversation
which would tend in any degree to shed light upon the fact as to
when he did arrive at Pierre; and a statement then made that he
was present at the homicide, and saw what occurred, would have
tended strongly to prove that his two statements were perfectly
consistent with each other.   Budd had testified to facts which, if

true, were very important to the defendant in his defense. If the jury believed that Budd was not present because he had only arrived at Pierre on the 14th or 15th of April, four or five days after the homicide, then all his testimony relating to facts transpiring at that time, they would have disregarded; whereas, if Maxon had testified as defendant's counsel offered to prove by him that so shortly after the occurrence, Budd had told him that he was present, and gave him a detailed statement of what there occurred, the effect of Maxon's testimony would have likely been in defendant's favor, rather than against him.

The exclusion of this testimony which was proper to be adduced upon cross-examination, it being a part of the same conversation called out by the examination in chief, was manifest error which must have prejudiced the defendant, and for this error thus manifestly prejudicial to the defendant, the judgment must be reversed and a new trial awarded.

The other points made by counsel are not important now to be considered except we may remark that the exceptions urged to the instructions of the learned Chief Justice who presided at the trial, are not well taken. His charge upon the law of self defense objected to was as favorable to the defendant as the facts in the case would warrant.

The judgment is reversed, a new trial ordered, and the cause remanded for further proceedings according to law.

All of the Justices concurring.